755 A.2d 602 (2000)
333 N.J. Super. 247
STATE of New Jersey, Plaintiff-Appellant,
v.
Richard RAVOTTO, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 2000.
Decided July 12, 2000.
Susan W. Sciacca, Deputy First Assistant Prosecutor, for plaintiff-appellant
*603 (William H. Schmidt, Bergen County Prosecutor, attorney; Ms. Sciacca, of counsel and on the brief).
Robert J. Bates, Westwood, for defendant-respondent Richard Ravotto.
Ronald K. Chen, Newark, for amicus curiae, American Civil Liberties Union of New Jersey (Ronald K. Chen, Rutgers Constitutional Law Clinic, and Lenora M. Lapidus, attorneys; Ms. Lapidus and Mr. Chen, on the brief).
Before Judges HAVEY, KEEFE and A.A. RODRÍGUEZ.
The opinion of the court was delivered by RODRIGUEZ, A.A., J.A.D.
In this appeal from a drunk-driving conviction, we hold that the extraction of an uncooperative driver's blood, by a nurse in a hospital emergency room, while police officers are restraining the driver, does not violate the driver's federal or state constitutional right.
Richard Ravotto, age twenty-six, was arrested in Edgewater and charged with driving while under the influence, contrary to N.J.S.A. 39:4-50. Ravotto filed a motion to suppress the results of his blood alcohol analysis, which was denied by the Edgewater Municipal Court. Ravotto entered a conditional plea of guilty, pursuant to R. 7:6-2(c). He then appealed the denial of the motion to the Law Division.
The Law Division decided the motion de novo based upon the record of the municipal court motion hearing. The American Civil Liberties Union of New Jersey (ACLU) appeared as amicus curiae in the Law Division. The judge granted the motion and ordered the suppression of the blood evidence taken from Ravotto. We granted the State's motion for leave to appeal. We now reverse.
On January 18, 1997, at approximately 6:00 a.m., Edgewater Police Officers Steven Kochis and Edmund Sullivan responded to a call regarding a one vehicle accident on River Road. When the officers arrived at the scene they discovered an overturned car wrapped in a chain link fence on the side of the road. The two officers found Ravotto, conscious, inside the overturned vehicle in the rear seat. They asked him if he was injured and if there were others in the car. Ravotto replied that he was not injured and that he was alone in the vehicle. However, moments later, Ravotto exclaimed, "Hurry up, hurry up, there's three of us in here." The officers searched the area to see if any other passengers had been thrown from the car. No other victims were found. According to Kochis, firemen on the scene extracted Ravotto from the wreckage of his vehicle. Ravotto alleges that he crawled out of the rear car window without assistance.
Officer Kochis noted that there was a strong smell of alcohol emanating from Ravotto's breath. Ravotto admitted, at the suppression hearing, that he had consumed alcoholic beverages on the night of the accident. Officer Kochis told Ravotto that the ambulance corps wanted to take him to the hospital. Ravotto replied, "I don't need any hospital. I don't need any ambulance people. I'm okay." Officer Kochis insisted that Ravotto go to the hospital. When Ravotto physically resisted, Officer Kochis and certain emergency personnel restrained him, placed him on a backboard, and attached a stabilizing collar around his neck. When Ravotto continued to resist, Kochis handcuffed him and strapped him to the backboard. Kochis told Officer Sullivan to escort Ravotto to the hospital and to have a blood sample taken. Ravotto was placed under arrest for driving under the influence.
At 6:45 a.m., Ravotto, Sullivan, and the ambulance personnel departed for Englewood Hospital. During the trip, Ravotto remained "very combative." He attempted to sit up off the board and "was trying to rip the neck collar off" his neck. This behavior continued for the entire trip to *604 Englewood Hospital, which is in a neighboring town.
Upon arrival at the hospital, Ravotto was placed in a treatment room. A doctor entered in order to examine him. While the doctor was taking Ravotto's blood pressure, Ravotto attempted to punch him. Ravotto was placed in restraints. Officer Sullivan testified that he remained with Ravotto at all times because he did not think it was safe to leave him alone.
Next, Officer Sullivan requested Emergency Room Nurse Joseph Solda to draw blood from Ravotto to determine his blood alcohol level. Officer Sullivan also called the Edgewater Police Station to ask that a police blood alcohol kit be brought to Englewood Hospital. Approximately one hour later, Officer Ed Ring arrived at the hospital with the kit.
Nurse Solda went into the room and informed Ravotto that he was going to withdraw a blood sample. Ravotto tried to prevent Solda from withdrawing his blood. Nurse Solda testified that it was critical to keep a patient stable to avoid unnecessary complications that could be caused by movements of the patient during the withdrawal process. Officers Sullivan and Ring then restrained Ravotto on the table, so the blood sample could be taken. Sometime between 8:12 a.m. and 8:30 a.m., Nurse Solda took a total of eight vials of blood, four for the police kit and four for the hospital. Nurse Solda testified that:
The police sample required four samples, two plain red tops and two grey/red tops. The hospital, since he was being treated as a patient, four other tubes were drawn and sent for our hospital analysis a CBC, blood count, alcohol level, PT, PTT and type and screen was held due to the nature of these injuries.
A security camera videotape, which is part of the record, shows the extraction of blood from Ravotto by Nurse Solda. At first, Solda enters the room where Ravotto is handcuffed to a hospital bed. Ravotto says something to Solda, and then Solda leaves the room. He comes back with the two police officers and another male nurse. The two officers hold Ravotto's left arm and the two nurses hold Ravotto's right arm. Then the blood is drawn. During the process, Ravotto does not struggle and his feet, and legs, which are unrestrained, lie still.
After drawing the blood, Solda sealed the sample in the police blood kit and handed it over to Sullivan. Sullivan then returned to headquarters and handed the sealed containers to Detective Alex Hanna. The blood alcohol level was 0.288%.
Ravotto was retained by the hospital staff until 3:00 p.m. At that time, he was released to the custody of his father. According to Solda, Ravotto was not released earlier because it was against the law for the hospital to release any individual who had a blood alcohol level greater than 100 deciliters per milligram.
Ravotto testified that he had a lifelong fear of needles and a fear of contracting a deadly, blood-related disease. He continually screamed, "I don't want my blood to be taken," and "I have no problem giving you a breathalyzer sample if that's what you want but do not take my blood." Ravotto further testified that being held down "was a violation" and he "felt like [he] was being raped."
The Law Division judge found that the police acted properly and lawfully in taking defendant to the hospital based on the facts known to Officer Kochis at the time of the accident. Further, the judge held that the police officers were not required to obtain Ravotto's consent prior to taking his blood and that reasonable force could be used. Additionally, the judge found that the blood was withdrawn in a medically acceptable manner. However, the judge held that the blood sample evidence was inadmissible because there were no exigent circumstances that would avoid the necessity of a search warrant. Specifically, the judge ruled that because of the delay in having the blood drawn, the police *605 officers were required to obtain a telephonic search warrant pursuant to R. 3:5-3(b). The judge concluded "that the State had an absolute right to take the blood sample against the will of [Ravotto]. The State first had to obtain a warrant."
On appeal, the State contends that the judge erred in concluding that the police officers were required to obtain a search warrant under the circumstances presented. We agree.
We begin our analysis with a review of well-settled principles. It is axiomatic, under the Federal Constitution, that all individuals have the right "to be secure in their persons ... and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures, however, may be lawfully undertaken in many circumstances. One such circumstance is when a search warrant is obtained from a neutral judicial officer. Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527, 547, reh'g den., 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983); State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149 (1983). Although search warrants are preferred, there are limited exceptions when the lack of a warrant will still be constitutional. For example, when exigent circumstances or emergency situations exist, whereby a police officer cannot reasonably obtain a search warrant, a search will not automatically violate the fourth amendment. See Terry v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904-05 (1968). Even bearing this exception in mind, a warrantless search mandating intrusion into the human body should be scrutinized very closely. Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835-36, 16 L.Ed.2d 908, 918-20 (1966); see Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).
Schmerber is the seminal case regarding the warrantless extraction of blood from a defendant charged with driving under the influence. In Schmerber, the defendant was involved in a motor vehicle accident and taken to the hospital for treatment of his injuries. Schmerber, supra, 384 U.S. at 758, 86 S.Ct. at 1829, 16 L.Ed.2d at 912. The police officer on the scene noted that the defendant appeared to be under the influence of alcohol. Id. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. Later at the hospital, the police officer arrested the defendant and directed a physician to take a blood sample over the defendant's refusal. Id. at 758-59, 86 S.Ct. at 1829, 16 L.Ed.2d at 912-13.
The United States Supreme Court held that the extraction of blood over a defendant's objection and without a warrant would only be reasonable if certain critical factors were met. Id. at 768-71, 86 S.Ct. at 1826-28, 16 L.Ed.2d at 918-19. These factors include: the existence of exigent circumstances making it too difficult to obtain a warrant; the reasonableness of the officers actions considering the circumstances, and the sample must be taken in a medically acceptable manner. Ibid. The Court in Schmerber, found the blood extraction to be reasonable, but advised that "[i]t would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force." Id. at 760 n. 4, 86 S.Ct. at 1830 n. 4, 16 L.Ed.2d at 913 n. 4.
The Court stated that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Id. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. The Court discussed how blood tests are "highly effective means of determining the degree to which a person is under the influence." Id. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920 (citing Breithaupt v. Abram, 352 U.S. 432, 436 n. 3, 77 S.Ct. 408, 411 n. 3, 1 L.Ed.2d 448, 451 n. 3 (1957)). As such, the Court opined that a blood test is reasonable because it "involves virtually no risk, trauma, or pain." Ibid. In finding the procedure utilized to be reasonable, *606 the Court discussed how "the delay necessary to obtain a warrant under the circumstances, threatened `the destruction of evidence.'" Id. at 770, 86 S.Ct. at 1835-36, 16 L.Ed.2d at 919. (citation omitted).
In State v. Macuk, 57 N.J. 1, 15, 268 A.2d 1 (1970), the defendant contested his conviction for drunk driving because he did not voluntarily or knowingly consent to the taking of a breathalyzer test. In rejecting the defendant's claims, our Supreme Court held that the State has "a clear legal right to require a motor vehicle operator, arrested on probable cause for driving `under the influence' or "while impaired', to submit to a chemical test of bodily substances to determine the amount of alcohol in his blood." Id. at 14, 268 A.2d 1. The Court also stated that because breathalyzer tests do not violate any constitutional safeguards "and are permissible as in any other non-testimonial situation... acquiescence is not legally significant or necessary." Id. at 15, 268 A.2d 1.
In State v. Dyal, 97 N.J. 229, 240, 478 A.2d 390 (1984), the Supreme Court held that the use of the defendant's blood sample, taken for other purposes, was not violative of the fourth amendment. In Dyal, blood was extracted from the defendant by the hospital for purposes of medical treatment. Id. at 233, 478 A.2d 390. Four days after the accident, police determined that alcohol might have played a role and subpoenaed the blood samples. Id. at 233-34, 478 A.2d 390. The Court found that the use of this blood sample, in an emergency situation, fell within one of the warrant exceptions. Id. at 239-40, 478 A.2d 390. The Court reasoned that "[a]lthough search warrants ordinarily might be required where no emergency exists, in emergencies police may search for and seize evidence without first obtaining a search warrant." Id. at 239, 478 A.2d 390 (citations omitted). The Court also discussed the evanescent nature of blood alcohol evidence and the difficulties in obtaining a warrant "before seeking an involuntary blood test of a suspected drunken driver." Id. at 239-40, 478 A.2d 390.
In State v. Woomer, 196 N.J.Super. 583, 586-87, 483 A.2d 837 (App.Div.1984), we held that a police officer's threat of the use of force to obtain a blood test was not unreasonable. The defendant, in Woomer, submitted to the blood test after first refusing the test when the police officer said, "we could use force." Id. at 585, 483 A.2d 837. However, no actual force was administered during the blood test. As to the issue of force, we stated,
While we might conceive of circumstance in which threats of force or violence are of such an egregious nature as to implicate a due process claim or negatively affect the integrity of the medical environment, that is not the case before us.

[Id. at 586-87, 483 A.2d 837]
We reasoned, relying on Dyal, that an individual resisting a blood sample could be "restrained in a medically acceptable way as could any other uncooperative patient." Id. at 586, 483 A.2d 837.
We conclude that the logical inference from the Macuk, Dyal, and Woomer holdings is that a motor vehicle driver arrested for driving under the influence has no legal right to refuse chemical testing and the police are not required to obtain his or her consent. Further, such a driver can be restrained in order to extract a blood sample.
Here, it is clear that Officers Kochis and Sullivan were acting reasonably and responsibly when they compelled Ravotto to go to the hospital. The officers had reason to believe that Ravotto could have internal injuries. This determination, thus, precluded the taking of a breathalyzer test. Such tests are accurate only if performed with well-calibrated equipment. The breathalyzer machine used by the Edgewater Police is maintained at headquarters. There is no breathalyzer machine at the hospital. Therefore, given the evanescent nature of blood alcohol levels, the *607 decision to take Ravotto to the hospital meant that if his blood alcohol level was to be tested at all, it could not be by way of a breathalyzer test. The only viable alternative was by way of blood analysis. In view of the fact that the hospital was going to draw blood from Ravotto for its own purpose, the police intrusion here was minimal. Moreover, we note that the Law Division judge made the same finding.
However, the Law Division judge placed great weight on the fact that the police officers could have obtained a telephonic warrant during the one hour plus delay in extracting the blood. During that period, the judge reasoned, the officer could have obtained a warrant. Based on that, the judge granted the motion to suppress. We disagree with the trial judge on this point. The reasonableness of the police officers' action to seek a blood sample must be scrutinized as of the time the decision was made, not in light of subsequent developments. There were exigent circumstances justifying the taking of blood samples without obtaining a telephone warrant at the time the decision was made to send Ravotto to the hospital. These exigent circumstances continued up until the time of the extraction. It is irrelevant that there was a delay in obtaining the police kit. We are not aware of any authority that requires that if exigent circumstances are present, the police officers must still pursue a search warrant in case a delay occurs.
We now turn to the issue of force, actually restraints, which is raised by Ravotto and the ACLU. It is obvious from the tape and the testimony, that Ravotto did not want to be at the hospital. He did not want to be examined. He did not want his blood pressure taken. He did not want his blood extracted. He did not like being restrained. The tape shows that he called the police officers, who were just outside the door, repeatedly to come into the treating room. In short, he was belligerent and uncooperative. However, this lack of cooperation does not preclude the lawful taking of a blood sample by using restraints. See Dyal, supra, 97 N.J. at 240, 478 A.2d 390. We therefore conclude that the taking of Ravotto's blood, without a search warrant, was lawful given the following facts: there was a substantial likelihood that he was driving under the influence; he needed medical treatment; a breathalyzer test was not feasible; and the hospital needed to draw blood for its own purposes.
Accordingly, we reject the following contentions from Ravotto's responding brief contending: (1) defendant's State and Federal rights were violated by the taking of his blood without a warrant and against his will; (2) Schmerber v. California does not provide the State with a license for the warrantless forced taking of blood; (3) the use of force to extract defendant's blood constitutes an unconstitutional search and seizure; (4) the forcible penetration of an extraction of blood after Ravotto consented to the equally reliable and unintrusive breathalyzer test, is per se unreasonable; (5) the use of force to extract defendant's blood deprived Ravotto of due process of law; and (6) the extraction of blood without warrant or opportunity to be heard violates procedural due process. The ACLU as amicus curiae filed a brief contending that the use of force to extract Ravotto's blood was an unconstitutional search and seizure and deprived him of due process of law. These arguments are without merit and do not warrant discussion in a written opinion. R. 2:11-3(e)(2).
We merely note that Ravotto's belated offer to provide a breath sample was an empty one. It was not really feasible at the time and under the circumstances when it was made.
Moreover, the ACLU has brought to our attention the very recent case of Jiosi v. Township of Nutley, 332 N.J.Super. 169, 753 A.2d 132 (App.Div.2000). The holding in that civil case does not affect and is not contrary to our holding in this case.
*608 Accordingly, the order granting the motion to suppress is reversed. The matter is remanded to the Law Division for the entry of a judgment of conviction.